Argued and submitted May 10, affirmed August 11, 2010

In the Matter of K. R. C.
and I. A. C., Children.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*and*

K. R. C.,
I. A. C., C. R., and D. R.,
*Respondents,*

*v.*

THREE AFFILIATED TRIBES
OF FORT BERTHOLD RESERVATION,
*Appellant.*

Wasco County Circuit Court
J06073, J06096;
Petition Numbers J0607301, J0609601;
A143921

238 P3d 40

Lea Ann Easton argued the cause for appellant. With her on the brief was Dorsay & Easton LLP.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent Department of Human Services. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Megan L. Jacquot argued the cause and filed the brief for respondents K. R. C. and I. A. C.

No appearance for respondents C. R. and D. R.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

HASELTON, P. J.

## HASELTON, P. J.

The Three Affiliated Tribes of Fort Berthold Reservation (the tribes) appeal a judgment in which the trial court concluded that "good cause" under the Indian Child Welfare Act (ICWA) existed to designate the adoptive placement for two Indian children as the home of their current foster parents rather than the home designated by the tribes. On appeal, the legal issue is whether "good cause" exists to depart from ICWA's placement preferences. 25 USC § 1915(a).[1] As we will explain, we are bound by the trial court's findings of fact if there is any evidence in the record to support them, but independently assess whether those findings are sufficient to support the trial court's legal conclusion that "good cause" exists under the circumstances of this case. Applying that standard, we affirm.

■       Before turning to the facts of this case, we begin by identifying the appropriate standard of review. Historically, pursuant to ORS 19.415(3) (2007) and ORS 419A.200(6) (2007), in juvenile cases such as this one, we reviewed the facts *de novo*.[2] In other words, we "independently assess[ed] and evaluate[d] the evidence," *State ex rel SOSCF v. Frazier*, 152 Or App 568, 572, 955 P2d 272, *rev den*, 327 Or 305 (1998), and "reweigh[ed] the facts and reassess[ed] the persuasive force of the evidence," *Marvin Wood Products v. Callow*, 171 Or App 175, 180, 14 P3d 686 (2000). In 2009, however, the legislature amended ORS 19.415(3) to change our standard of review.[3]

---

[1] The text of 25 USC section 1915(a) is set out below. 236 Or App at 547.

[2] ORS 19.415(3) (2007), *amended by* Or Laws 2009, ch 231, § 2, provided that, "[u]pon an appeal from a judgment in an equitable proceeding, the Court of Appeals shall try the cause anew upon the record." Relatedly, with regard to juvenile cases, ORS 419A.200(6) (2007), *amended by* Or Laws 2009, ch 231, § 6, provided, in part:

"An appeal to the Court of Appeals must be conducted in the same manner as an appeal under ORS chapter 19 except that:

"* * * * *

"(b)  The court's scope of review is de novo on the record."

[3] Those amendments to ORS 19.415 apply to appeals, such as this one, in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, § 3. We also note that, in 2009, the legislature amended ORS 419A.200(6) to eliminate the reference to the *de novo* standard of review in juvenile cases. Or Laws 2009, ch 231, § 6. Those amendments also apply to this case. Or Laws 2009, ch 231, § 10.

Specifically, ORS 19.415(3) now provides:

"Upon an appeal in an equitable action or proceeding, review by the Court of Appeals shall be as follows:

"(a)   Upon an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals shall try the cause anew upon the record; and

"(b)   Upon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."

Pursuant to ORS 19.415(3)(b), because this case does not concern the termination of parental rights, we need not review *de novo* but have discretion to do so.

Our decision whether to exercise that discretion is governed by a temporary amendment to ORAP 5.40 that is embodied in Chief Judge Order 09-06.[4] Specifically, ORAP 5.40 provides, in part:

"The appellant's opening brief shall open with a clear and concise statement of the case, which shall set forth in the following order under separate headings:

"* * * * *

"(8)(a)   In those proceedings in which the Court of Appeals has discretion to try the cause anew on the record and the appellant seeks to have the court exercise that discretion, the appellant shall concisely state the reasons why the court should do so.

"(b)   In those proceedings in which the Court of Appeals has discretion to make one or more factual findings anew on the record and the appellant seeks to have the court exercise that discretion, the appellant shall identify with particularity the factual findings that the appellant

---

[4] The text of Chief Judge Order 09-06 may be found on the Oregon Judicial Department's website at http://www.ojd.state.or.us/web/ojdpublications.nsf/Files/Temporary_Amendments_to_ORAP_5.40_and_ORAP_5.45.pdf/$File/Temporary_Amendments_to_ORAP_5.40_and_ORAP_5.45.pdf (accessed June 24, 2010). The order provides that the temporary amendment to ORAP 5.40 expires "on December 31, 2010, if not previously adopted as a permanent amendment."

seeks to have the court find anew on the record and shall concisely state the reasons why the court should do so.

"(c)   The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases. Consistently with that presumption against the exercise of discretion, requests under paragraph (a) or (b) of this section are disfavored."

(Footnote omitted.)

To summarize, ORAP 5.40(8)(a) and (b) require that, if an appellant seeks to have us exercise our discretion to review *de novo*, the appellant must include a concise statement explaining the reasons why we should do so in its statement of the case in the opening brief. In the face of such a request, our decision whether to exercise discretion is guided by the nonexclusive list of considerations stated in ORAP 5.40(8)(d).[5] However, a presumption exists "against the exercise of discretion" and we will exercise it "only in exceptional cases." ORAP 5.40(8)(c).

---

[5] ORAP 5.40(8)(d) provides:

"The Court of Appeals considers the items set out below to be relevant to the decision whether or not to exercise its discretion to try the cause anew on the record or make one or more factual findings anew on the record. These considerations, which are neither exclusive nor binding, are published to inform and assist the bar and the public.

"(i) Whether the trial court made express factual findings, including demeanor-based credibility findings.

"(ii) Whether the trial court's decision comports with its express factual findings or with uncontroverted evidence in the record.

"(iii) Whether the trial court was specifically alerted to a disputed factual matter and the importance of that disputed factual matter to the trial court's ultimate disposition of the case or to the assignment(s) of error raised on appeal.

"(iv) Whether the factual finding(s) that the appellant requests the court find anew is important to the trial court's ruling that is at issue on appeal (*i.e.,* whether an appellate determination of the facts in appellant's favor would likely provide a basis for reversing or modifying the trial court's ruling).

"(v) Whether the trial court made an erroneous legal ruling, reversal or modification of which would substantially alter the admissible contents of the record (*e.g.,* a ruling on the admissibility of evidence), and determination of factual issues on the altered record in the Court of Appeals, rather than remand to the trial court for reconsideration, would be judicially efficient."

In its opening brief in this case, the tribes appear to have assumed that, as had been the case historically, our review is *de novo*. In their brief, the tribes do not acknowledge the 2009 amendments to ORS 19.415 and, contrary to the requirements of ORAP 5.40(8)(a), do not request that we exercise our discretion to review *de novo* or explain the reasons that we should do so. In the absence of such a request and in light of the "presumption against the exercise of discretion," ORAP 5.40(8)(c), we decline, under the circumstance of this case, to exercise our discretion under ORS 19.415(3)(b) to review *de novo*.[6]

■      Consequently, our standard of review in this case is governed by ORS 19.415(1), which provides:

> "[U]pon an appeal in an action or proceeding, without regard to whether the action or proceeding was triable to the court or a jury, the scope of review shall be as provided in section 3, Article VII (Amended) of the Oregon Constitution."

Stated differently, "[o]ur review * * * is limited to examining the record to determine if there is any evidence to support the trial court's factual findings." *G. I. Joe's, Inc. v. Nizam*, 183 Or App 116, 123, 50 P3d 1282 (2002).

---

[6] Nonetheless, we note that, at oral argument, the attorney for the tribes requested for the first time that we exercise our discretion to review *de novo*. We understand that the tribes' belated request was fundamentally predicated on the contention that, because the outcome of this proceeding could effectively sever the Indian children's relationship with the tribes, this proceeding is sufficiently similar to a termination of parental rights proceeding such that our standard of review in both types of proceedings should be the same—that is, *de novo*. *See* ORS 19.415(3)(a) (providing for *de novo* review in a proceeding for the termination of parental rights).

Although we agree with the tribes that this case implicates important federal policies underlying ICWA's placement preferences in proceedings involving the adoptive placement of Indian children—a placement that will critically alter the course of the children's lives and their relationships—our standard of review is not governed by the importance of the policies implicated in a given case. We routinely resolve legal issues that implicate important federal and state policies and the rights and duties, as well as the liberty interests, of the citizens of this state. Moreover, we routinely resolve those issues without engaging in *de novo* review. Accordingly, even if we were to consider the tribes' belated request, we would decline to exercise our discretion to review *de novo*, particularly where, as here, the trial court issued extensive factual findings, ORAP 5.40(8)(d)(i), and its decision comports with those findings, ORAP 5.40(8)(d)(ii).

Here, our review of the record confirms that we are bound by the relevant trial court findings, because they are supported by evidence in the record. Accordingly, we state the facts consistently with those findings and augment them where necessary with uncontroverted background and procedural facts.

Mother and father moved to The Dalles from Pierre, South Dakota, in 2006 when their daughter, K, was a few months old and mother was pregnant with their son, I.[7] In December 2006, I was born. Shortly after I's birth, he and K were placed in foster parents' home, where they have lived ever since.

In July 2008, mother's and father's parental rights were terminated. Father stipulated to the termination of his parental rights. We affirmed the judgment that terminated mother's rights without opinion in May 2009.

During the course of this ongoing dependency proceeding, two significant events occurred. First, mother became an enrolled member of the tribes. As a result, the children became eligible for membership under the tribes' rules and were considered Indian children under ICWA.[8] Second, a couple (grandparents) who lived in Pierre, and had been mother's guardians when she was a child, adopted her as an adult—and, consequently, became the children's grandparents. The tribes, consistently with their law and customs, considered grandparents to be "extended family members" for purposes of ICWA's placement preferences.[9]

---

[7] As we will explain, *see* 236 Or App at 542, mother's and father's parental rights were eventually terminated. Nonetheless, for ease of reference, throughout this opinion, we use the terms "mother," "father," or "parents" when we refer to those individuals.

[8] An "Indian child" for purposes of ICWA "means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 USC § 1903(4).

[9] An " 'extended family member' shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent[.]" 25 USC § 1903(2).

Foster parents want to adopt the children—and so do grandparents. Neither foster parents nor grandparents are "Indian."[10] The tribes seek to have grandparents designated as the children's adoptive placement in accordance with ICWA's placement preferences, which provide, in part, that "preference shall be given, *in the absence of good cause to the contrary*, to a placement with * * * a member of the child's extended family[.]" 25 USC § 1915(a) (emphasis added).

As noted by the trial court in its detailed letter opinion, foster parents' home and grandparents' home "have some similarities." For example, "[b]oth are experienced foster homes," and both have previously adopted children, including children of Native American heritage.[11] However, as the trial court noted,

"[t]he two homes also have distinctions.

"There are no children presently in [grandparents'] home. However, [grandparents] have an ongoing relationship with [mother], who has returned to Pierre. She visits them, and brings her new son to visit. She uses a day care facility on their property * * *. [Grandparents] also have ongoing relationships with other members of [mother's] biological family. The members of [mother's] biological family described by [grandmother] suffer from similar problems of addiction, criminality, unemployment, homelessness, and under-education that have plagued [mother]. [Grandparents] intend [the children] to have ongoing relationships with [mother], her new son, and [mother's] biological family, if they deem it 'safe.'

"[Foster parents'] home is probably the only home [K] remembers, and is the only home [I] has ever known. It is decorated with Indian art. [Foster parents] have taken their children, including [K] and [I] to local Indian festivals, and have contacted a local Indian woman to help [K] and [I] understand their Indian heritage. They intend to travel to the Tribes' reservation to help [K] and [I] understand their specific cultural heritage.

---

[10] Under ICWA, "Indian" is defined, in part, as a "member of an Indian tribe." 25 USC § 1903(3).

[11] Our understanding of the record is that grandparents adopted an Indian child before ICWA was enacted and foster parents are currently raising an adopted child of Native American heritage.

"[K] is now an apparently untroubled little girl, although her life was disrupted when her parents' behavior made it necessary to first place her in foster care. [I] is delayed in receptive language, and to a greater degree, expressive language. He suffers from a swallowing disorder. * * * [Foster parents] have taken him to specialists, and work regularly with him on his language skills. [K] often acts as his interpreter, and as his boss. Both children are bonded to [foster parents] as their father and mother. Despite his delays, [I] calls them 'dada' and 'momma.' [Grandparents] have spent no more than a few hours in [K's] presence since [her parents] brought her to The Dalles, and no more than a few hours with [I] in his lifetime.

"[Foster parents] and the Tribes have intervened in [K's] and [I's] dependency cases, making them parties to those cases. [Grandparents] have not intervened, but [grandmother has] 'rights of limited participation.' The State filed a motion for a review hearing '* * * to address * * * placement of the children, including ICWA issues * * *.' The motion [raised] the present issue, whether there is good cause to place the children in an adoptive home, [foster parents'] home, that is not [ICWA's] preferred home nor the Tribes' preferred home of extended family. The State proposes to place [the children] in [grandparents'] home.

"Several experts testified at the hearings on the State's motion, regarding the risks and benefits of adoption in either home. Ms. Strickland is a clinical social worker who evaluated [the children] * * *. Ms. Smutz is [the children's] DHS caseworker. Mr. St. Martin is the social services director for the Yurok Tribe of Northern California. Ms. Felix is the Tribes' ICWA representative. Generally, I found Ms. Strickland and Ms. Smutz credible regarding [the children], and the effect on them of moving them from [foster parents'] home. I also found Mr. St. Martin and Ms. Felix credible regarding the more general effect on Indian children of being isolated from their Indian culture.

"Although the experts disagreed about where [the children] should be placed, they agreed on two major points. [The children] will be harmed by a move, and it is important that they grow up aware of their own tribal culture. I accept both propositions. *I also accept Ms. Strickland's testimony that the harm to [the children] will be serious and lasting, if they are moved from [foster parents'] home.*"

(Brackets in original omitted; third and fourth omissions in original; emphasis added.)

In light of those findings, the court ultimately reasoned that foster parents had demonstrated that "good cause" existed to depart from ICWA's placement preferences. Specifically, the court stated:

"If the Indian Child Welfare Act did not apply to the present case, [K] and [I's] adoptive placement would be a simple issue. 'The primary purpose of adoption proceedings is the promotion and protection of a child's best interests.' *P and P [v.] Children's Services Division*, 66 Or App 66, 72[, 673 P2d 864] (1983). [K] has been in [foster parents'] home almost all of her life. [I] has been in [foster parents'] home all of his life. From their perspective as children, [foster parents] are their mother and father: the people they know to love, nurture and protect them. [Foster parents] meet [I's] special needs. [Foster parents] will raise [K] and [I] in a multi-racial home, connect them to local Indian culture, and take them to the Tribes' reservation to learn of their specific tribal culture, achieving each of the goals the various experts testified are important for [K's] and [I's] well being. It would serve no purpose, and certainly would not be in [K's] and [I's] best interests, to take them from their good home with the hope that another will be better. * * *

"Since the Act does apply to the present case, I must also examine the suitability of [grandparents'] home as a placement for [K] and [I]. I am sure it is a home with many virtues. However, * * * [i]t is a home in which [mother] * * * claimed to have been sexually abused. * * * It is a home in which [K] and [I] will be exposed to biological family, a circumstance which Ms. Strickland credibly testified will damage [K]. It is also a home in which [I's] special needs may or may not be met. * * *

"* * * [T]he right placement of these children is a question of balancing degrees of harm against degrees of benefit. When I balance those, I conclude that the harm to these children in removing them from their home outweighs any other consideration by a degree of magnitude."

Ultimately, the court entered a judgment in which it concluded that "good cause exists to place the * * * children in an adoptive home that is contrary to the home designated by the [tribes]." The tribes appeal.

On appeal, the tribes contend that the trial court erred in determining that good cause existed to deviate from ICWA's placement preferences. The tribes' position is based on their understanding that

"the intent of [ICWA's] placement provisions * * * are to whenever possible place Indian children within their tribal community and extended family by establishing placement preferences and requiring state court and state child protective agencies to follow an Indian Tribe's placement preference for tribal children in the absence of a finding of good cause to the contrary."

Specifically, the tribes assert that the trial court's decision contravened the intent underlying ICWA's placement provisions in two ways. First, the tribes contend that the court misunderstood its role in examining the suitability of grandparents' home and used that consideration "to justify comparison of the two homes based on subjective factors that were culturally biased" and "to substitute [its] judgment * * * for that of the * * * professional determination of the suitability of [grandparents'] home" that was made by the tribes as well as the states of Oregon and South Dakota. Second, we understand the tribes to contend that the trial court's determination that it was in the children's best interests to be adopted by their foster parents was erroneous because, "[i]f th[at] were the standard for good cause under * * * ICWA, no Indian child could ever be removed from any non-Indian placement and the policies and intent of * * * ICWA would be completely negated."

Conversely, the children contend on appeal that the trial court did not abuse its discretion in determining that good cause existed to deviate from ICWA's placement preferences. According to the children, in making that determination, the trial court properly considered the best interests of the children.[12] Specifically, the children contend that they

---

[12] The Department of Human Services (DHS) also appeared as a respondent on appeal. DHS "takes no position on the merits of the various parties' arguments concerning the actual placement of the * * * children." Nevertheless, DHS, consistently with the children's position, asserted that "a trial court may permissibly consider a wide range of factors and is not limited to those three factors identified in the Bureau of Indian Affairs[ ] interpretive guidelines."

"had been in [foster parents'] home for almost all of their lives. They were bonded to the entire family, relying heavily on the family to meet their ordinary and extraordinary needs. [K] had been subject to multiple moves, and Ms. Strickland testified that there would be damage lasting at least a few years if she was required to move again. With regard to [I], he would not be understood in the new home for a period of time. He was likely to regress even further if subjected to the stress and confusion a move would cause."

The parties' competing contentions present two issues of first impression in Oregon that we must resolve: (1) What considerations properly bear on a court's determination of the existence of "good cause" for purposes of 25 USC section 1915(a)? (2) What is the proper appellate standard of review of a trial court's "good cause" determination? The resolution of those two questions determines our disposition here.

Before addressing those two questions in detail, we begin with a general overview of the ICWA provisions and policies that inform our inquiry. ICWA embodies a congressional policy

"to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture * * *."

25 USC § 1902. To further that policy, ICWA establishes preferences for the adoptive placements of Indian children. Specifically, 25 USC section 1915(a) provides:

"In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families."

Section 1915(a) embodies the federal policy that, "where possible, an Indian child should remain in the Indian community" and is "[t]he most important substantive requirement imposed on state courts." *Mississippi Choctaw Indian Band v. Holyfield*, 490 US 30, 36-37, 109 S Ct 1597,

104 L Ed 2d 29 (1989). In practical terms, section 1915(a) establishes a presumption that an adoptive placement in accordance with the preference criteria is in an Indian child's best interests. *See In re C.H.*, 299 Mont 62, 67, 997 P2d 776, 780 (2000) ("ICWA expresses the presumption that it is in an Indian child's best interests to be placed in an Indian home in conformance with the § 1915 placement preferences.").

Although that presumption may be rebutted if the court determines that "good cause" exists, ICWA does not define the term "good cause" as used in section 1915(a) and does not identify the considerations on which a good cause determination may be predicated. However, the Bureau of Indian Affairs (BIA) has promulgated guidelines that set forth three circumstances that may constitute good cause to depart from ICWA's placement provisions:

"F.3.  Good Cause to Modify Preferences

"(a)  For purposes of * * * adoptive placement, a determination of good cause not to follow the order of preference * * * shall be based on one or more of the following considerations:

"(i)  The request of the biological parents or the child when the child is of sufficient age.

"(ii)  The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

"(iii)  The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria."[13]

---

[13] We note that the commentary to the BIA guidelines significantly limits the application of the three considerations to particular, narrowly defined circumstances:

"The Act indicates that the court is to give preference to confidentiality requests by parents in making placements. Paragraph (i) is intended to permit parents to ask that the order of preference not be followed because it would prejudice confidentiality or for other reasons. The wishes of an older child are important in making an effective placement.

"In a few cases a child may need highly specialized treatment services that are unavailable in the community where the families who meet the preference criteria live. Paragraph (ii) recommends that such considerations be considered as good cause to the contrary.

"Paragraph (iii) recommends that a diligent attempt to find a suitable family meeting the preference criteria be made before consideration of a

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67,594 (1979).

We have noted in related contexts that the BIA guidelines are not an exclusive statement of the considerations that are pertinent to a "good cause" determination under ICWA. For example, in *State ex rel SOSCF v. Lucas*, 177 Or App 318, 324 n 4, 33 P3d 1001 (2001), *rev den*, 333 Or 567 (2002), the issue was whether "good cause" existed to deny a motion to transfer jurisdiction of an ICWA proceeding to the tribe. We reasoned that, "[a]lthough we have declined to adopt the BIA guidelines, we have recognized that they may be instructive." *Id.* The same is true here.[14]

Indeed, the introduction to the guidelines indicates that "they are not intended to have binding legislative effect" and that courts that decide ICWA cases have "primary responsibility" for "interpreting" the term "good cause." 44 Fed Reg 67,584 (1979). In particular, the introduction states that "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child."[15] *Id.*

In exercising their responsibility for amplifying and applying the term "good cause," courts across the country have identified a variety of considerations on which their decisions in individual cases have been predicated. "These include but are not necessarily limited to the best interests of

---

non-preference placement be considered. A diligent attempt to find a suitable family includes at a minimum, contact with the child's tribal social service program, a search of all county or state listings of available Indian homes and contact with nationally known Indian programs with available placement resources."

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67,594-95 (1979).

[14] *See State ex rel Juv. Dept. v. Charles*, 70 Or App 10, 16 n 3, 688 P2d 1354 (1984), *rev dismissed*, 299 Or 341 (1985) (declining to adopt the guidelines concerning the meaning of the term "expert witness").

[15] Notwithstanding that qualification, courts in other jurisdictions have characterized the BIA guidelines concerning the "good cause" determination as being exclusive. *See, e.g., Matter of Custody of S.E.G.*, 521 NW2d 357, 363 (Minn 1994), *cert den*, 513 US 1127 (1995) ("[A] determination that good cause exists to avoid the placement preferences of § 1915 should be based upon a finding of one or more of the factors described in the guidelines.").

the child, the wishes of the biological parents, the suitability of persons preferred for placement, the child's ties to the tribe, and the child's ability to make any cultural adjustments necessitated by a particular placement." *Adoption of M.*, 66 Wash App 475, 482, 832 P2d 518, 522 (1992) (citations omitted). "[T]he certainty of psychological and emotional trauma if the child is removed from the adoptive parents" and "the likelihood of emotional damage" to a child from contact with his or her biological parent if placed according to ICWA's preferences are also relevant considerations. *Matter of Baby Boy Doe*, 127 Idaho 452, 462-63, 902 P2d 477, 487-88 (1995).

Against that statutory backdrop of ICWA and the case law interpreting it, we return to the dispositive issue in this case—*viz.*, whether "good cause" existed to depart from ICWA's placement preferences. Resolution of that issue requires that we first examine the nature of a "good cause" determination as well as the proper standard by which to review it.

In their briefs, DHS and the children contend, without elaboration, that most courts that have addressed the issue have concluded that a trial court's good cause determination should be reviewed for abuse of discretion. *See, e.g., Adoption of M.*, 66 Wash App at 482, 832 P2d at 522 ("Good cause is a matter of discretion[.]"). However, for the reasons that we will explain, we disagree that a "good cause" determination is a matter of judicial discretion.

Generally, "good cause" is a legal standard. In *State v. Johnson*, 339 Or 69, 86, 116 P3d 879 (2005), the Supreme Court discussed the nature of a "good cause" determination in the context of a trial court's ruling on a motion to dismiss a criminal case on statutory speedy trial grounds:

> "We acknowledge the temptation to treat indefinite terms like 'good cause,' 'sufficient reason,' and 'reasonable period of time' as calling for a subjective determination and, thus, as invoking personal judgment. However, it is clear that, when such terms appear in a statutory context, they are focused on real, albeit sometimes difficult to discern, legal standards: the *legislature's* view of what is 'good,' 'sufficient,' or 'reasonable.' As such, in the absence of a factual

dispute, a determination that 'good cause' not to dismiss has been shown under *former* section 320 (or that 'sufficient reason' not to dismiss has been shown under present-day ORS 135.750) invokes an objective standard and must be reviewed for legal error. In no case would judicial *discretion* play any role in the 'good cause' determination of *former* section 321."

(Footnote omitted; emphasis in original.) *See also State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) ("If there is only one legally correct outcome, then 'discretion' is an inapplicable concept."); *Black's Law Dictionary* 251 (9th ed 2009) (defining "good cause" to include "[a] legally sufficient reason").

The Supreme Court's reasoning in *Johnson* applies equally to a "good cause" determination in the context of ICWA's placement preferences. That is so because, as we previously explained, one purpose of ICWA was to establish "minimum Federal standards" for the placement of Indian children in adoptive homes. The "good cause" exception to the placement preferences described in section 1915(a) is one such standard. Moreover, as the Court explained in *Holyfield*, "[i]t is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities." 490 US at 44-45. More specifically, citing various provisions of ICWA, including the placement preferences in section 1915, the Court noted that "[that] conclusion is inescapable from a reading of the entire statute, the main effect of which is to curtail state authority." *Id.* at 45 n 17. With the purposes underlying the statute so understood, it is likely that Congress intended a single set of facts in a given case to be either legally sufficient or legally insufficient to establish "good cause."[16]

---

[16] *Cf. Holyfield*, 490 US at 45 (looking, in part, to the purposes of ICWA to ascertain the intended meaning of the undefined term "domicile"; reasoning that "it is most improbable that Congress would have intended to leave the scope of the statute's key jurisdictional provision subject to definition by state courts as a matter of state law" and that "Congress could hardly have intended the lack of nationwide uniformity that would result from state-law definitions of domicile").

■ Accordingly, we conclude that "good cause" as used in the placement preferences of section 1915(a) is a legal standard and that, consequently, we review a trial court's "good cause" determination for errors of law. More particularly, that means that we must determine whether the facts, as found by the trial court and as supported by evidence in the record, are legally sufficient to establish "good cause" to depart from ICWA's placement preferences.[17]

That inquiry, in turn, requires some identification of those considerations that properly pertain to a judicial determination as to whether good cause exists to depart from ICWA's placement preferences. As we previously explained, courts across the country have relied on the BIA guidelines as well as other considerations in determining whether good cause exists in a given case. 236 Or App at 548-50. In this case, however, we need not identify the universe or totality of considerations that might bear on "good cause." That is so, because, regardless of whether, as an abstract proposition, in a different case or on a different record other considerations

---

[17] In their brief, children suggest in passing that a "good cause" determination must be based on clear and convincing evidence. We disagree for two reasons.

First, Congress did not expressly establish a heightened standard of proof with regard to the placement preferences in section 1915(a) even though it did so in other contexts. *See* 25 USC § 1912(e) ("No foster care placement may be ordered in such proceeding in the absence of a determination, supported by *clear and convincing evidence*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.)); 25 USC § 1912(f) ("No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence *beyond a reasonable doubt*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.)).

Second, at least one state looked to its own law in determining the standard of proof that applies to a "good cause" determination. *See Matter of Adoption of F.H.*, 851 P2d 1361, 1363 (Alaska 1993) ("Under state law, the [adoptive parents] have the burden of proof by a preponderance of the evidence that there is good cause for allowing a non-preferred placement."). Even if we were to do that here, a heightened standard of proof would be inappropriate because the children's adoptive placement is an issue related to the children's permanency plan of adoption and a preponderance standard of proof applies in permanency hearings. *See* ORS 419B.476(1) (providing, in part, that "[a] permanency hearing shall be conducted in the manner provided in ORS * * * 419B.310"); ORS 419B.310(3) (providing that "[t]he facts alleged in the petition showing the child to be within the jurisdiction of the court as provided in ORS 419B.100(1), unless admitted, must be established by a preponderance of competent evidence").

might properly pertain to a "good cause" determination, the trial court's "good cause" determination in this case was ultimately predicated on a consideration that is legally sufficient by itself to establish "good cause" and that is supported by evidence in this record.

Here, as noted, the trial court emphasized in its findings that "the harm to [K] and [I] will be serious and lasting, if they are moved from [foster parents'] home" and that, in grandparents' home, "[K] and [I] will be exposed to biological family, a circumstance which Ms. Strickland credibly testified will damage [K]." Given those findings, which were based substantially on the trial court's assessment of expert testimony, the court concluded that "the harm to these children in removing them from their home outweighs any other consideration by a degree of magnitude." Thus, the court's reasoning demonstrates that its "good cause" determination was fundamentally predicated on two considerations: (1) the serious and lasting harm that will result from the removal of the children from their current home and (2) the significant potential that the preferred caretakers will engage in conduct or conditions will exist in their home that would be seriously detrimental to the children.

■■     We agree with the trial court that both of those considerations are pertinent in determining whether good cause exists to depart from ICWA's placement preferences. We further conclude that, regardless of the trial court's assessment of the latter, the former is conclusive.

■     We fully appreciate the fundamental and compelling policies that underlie ICWA. We are also mindful of the tribes' expressed concerns that those policies can be subverted or eroded through judicial decision-making that partakes of cultural biases, either implicit or explicit, especially with respect to "good cause" determinations. Further, we are fully cognizant from our extensive experience in juvenile dependency matters that in virtually every case involving a change of custody from a well-established placement, the affected child or children will suffer some degree of emotional distress and dislocation. The nature, severity, and durability of that harm can vary greatly from case to case.

We are mindful of all of those things—and of our sworn obligation to apply ICWA consistently with that statute's mandates. But ICWA does not mandate effectuation of its placement preferences in every case. Rather, the statute explicitly provides that, notwithstanding a strong presumption of deference to the placement preferences, the presumption can, in special cases, be overcome by a showing of "good cause." "Good cause" properly and necessarily includes circumstances in which an Indian child will suffer serious and irreparable injury as a result of the change of placement.[18] Here, as noted, the trial court explicitly accepted as credible and persuasive expert testimony that "the harm to [the children] will be serious and lasting, if they are moved from [foster parents'] home." That finding, substantiated by evidence in this record, is legally sufficient to establish "good cause" for purposes of 25 USC section 1915(a).

Affirmed.

---

[18] In *Matter of Baby Boy Doe*, 127 Idaho at 462, 902 P2d at 487, the Idaho Supreme Court held that the trial court did not err in determining that good cause to deviate from ICWA's placement preferences existed, in part, because of "the certainty of psychological and emotional trauma if the child is removed from the adoptive parents." There, the court reasoned:

"The trial court stated there was little disagreement among the expert witnesses that a change in custody would have adverse consequences on the child's psychological and emotional well being. Rather, the conflict among the experts involved the degree of harm and the outlook for mitigating the trauma through planning, cooperation and counseling. Nevertheless, there was substantial agreement among the experts that emotional trauma would result from a change of custody. We recognize that the law cannot be applied to automatically reward those who maintain custody during protracted litigation. * * * But the certainty of emotional damage need not be ignored by the trial court in the balancing of interests."

*Id.*