Submitted September 29, 2021, affirmed January 5, 2022

In the Matter of A. O.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

R. O.
and K. O.,
*Appellants.*

Marion County Circuit Court
20JU05820; A175603

504 P3d 674

In this juvenile dependency case, father and mother appeal from the juvenile court's order that found good cause under ORS 419B.881(6) to restrict the Department of Human Services (DHS) from disclosing their child's medical records to them. The parents contend that (1) the court erred in determining that there was legally sufficient evidence to find "good cause," and (2) even if there was good cause, the court abused its discretion in relieving DHS of its obligation under ORS 419B.881(3) to provide their child's medical records. *Held*: There was legally sufficient evidence to support the juvenile court's determination that there was good cause and the court did not abuse its discretion in temporarily restricting the parents' access to their child's medical records.

Affirmed.

Natasha A. Zimmerman, Judge pro tempore.

Kristen G. Williams filed the briefs for appellant R. O.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Daniel J. Casey, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant K. O.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jon Zunkel-deCoursey, Assistant Attorney General, filed the brief for respondent.

Before James, Presiding Judge, and Lagesen, Chief Judge, and Kamins, Judge.

LAGESEN, C. J.

Affirmed.

**LAGESEN, C. J.**

In this juvenile dependency case, father and mother (parents) appeal the juvenile court's order that found good cause under ORS 419B.881(6) to restrict Department of Human Services (DHS) from disclosing their child's medical records to them. Parents contend that (1) the court erred in determining that there was legally sufficient evidence to find "good cause," and (2) even if there was good cause, the court abused its discretion in relieving DHS of its obligation under ORS 419B.881(3) to provide their child's medical records. We conclude that there was legally sufficient evidence to support the court's determination that there was good cause and that the court did not abuse its discretion in temporarily restricting parents' access to their child's medical records. Accordingly, we affirm.

Parents have not requested *de novo* review, and we decline to conduct such review here. *See* ORS 19.415(3)(b); ORAP 5.40(8)(c). We "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We state the facts in accordance with that standard of review.[1]

This case involves parents' child, A, who was 16 years old at the time of the hearing in this case. In August 2020, A had two emergency room visits; both visits triggered calls to the child-welfare hotline regarding concerns over A's welfare and parents' interactions with her. On August 14, A was taken to the Salem Hospital emergency room where

---

[1] Many of the facts restated here are taken from the shelter affidavit that was referenced by the child's attorney during the motion hearing and specifically acknowledged by the court during the hearing. On appeal, father argues that the court improperly relied upon the shelter affidavit because it was not formally entered into evidence, and the court did not comply with the requirements of ORS 419A.253 (outlining court's duty when the court relies on information that no party has offered into evidence nor requested that the court take judicial notice of during a hearing or proceeding that will result in an order or judgment). The state responds that father failed to object at the time of the hearing despite the court's opining that it had reviewed the affidavit and that it relied upon it in making its order. We agree that father's argument is unpreserved and we, like the juvenile court, draw salient facts from it.

she reported that father "hits her in the head so hard her head rings," and it was reported that parents were refusing to pick her up from the hospital on discharge. Then, on August 24, A attempted suicide and was taken to Randall Children's Hospital, where father's behavior while at the hospital prompted hospital staff's concerns for A and her mental health.

On October 9, 2020, a third report was made to the child-welfare hotline concerning parents' interactions with A. It was reported that A had gone into subacute treatment at Albertina Kerr at the end of August. The reporter noted that, after A's emergency room visit on August 24, parents were upset that the emergency room staff would not admit A and "caused them enough grief that hospital staff referred her to subacute to appease parents." The caller was concerned because A had been in subacute care much longer than customary due to parents' interactions which continually caused A to be dysregulated.

Albertina Kerr staff had tried to have a team meeting that included father, A's therapist, and a community-care coordinator, but father would not agree to any of the discharge plans. Also, father told A that he intended on sending her to a boarding school in Utah, and A had a breakdown. When staff contacted the school, they were told that the school could not accommodate A's mental health needs.

Father was not listening to recommendations, was not willing to engage in safety planning, and was not willing to have A register at school (versus waiting for a residential program/boarding school). Also, the caller reported that mother did not participate much in meetings or planning for A and, when she did, she "does not really talk." A had made progress and was stabilized enough to be discharged, but parents disagreed with the program's recommended discharge plan to return home. Instead, they insisted that A remain until she could enter a residential treatment program.

On October 13, a DHS worker, Tadeo, made contact with father, who expressed that A was in the "worst

shape now than [] when she first entered the program at Albertina Kerr." Tadeo then contacted the clinical supervisor at Albertina Kerr who reported that, when A entered the program, she was in crisis, but she was no longer experiencing suicidal ideation, had made significant progress, and was considered stable. A was actively engaged and doing well in individual therapy. However, according to Ramsey, A's individual and family therapist, family therapy had been a challenge. Ramsey spent most of the family-therapy sessions meeting with parents in order to give them examples of how to communicate with, support, and encourage A. Yet, once A would join the family sessions, father would not use any of the techniques and would resort to blaming A for past behaviors, triggering A to become dysregulated.

The next day, Tadeo participated in a conference call with parents and Albertina Kerr treatment staff to discuss A's discharge plan. During the meeting, father advised that he wanted to send A to a residential facility in Seattle; however, A refused, became dysregulated, and began harming herself by ramming into a wall. The providers did not agree that residential treatment was the best plan for A, but they were willing to appease parents and made a referral to a local residential treatment program. That program had a waiting list; as a result, A would have to be discharged home while she awaited an opening at the program, which might take weeks or months. Parents would not agree to any plan that involved A returning home—even if it was for a short period while she was awaiting a residential treatment placement. Tadeo also spoke individually with A, while her therapist was present. A reported that she did not feel safe returning home because "my parents will not support me with my treatment."

When A was set to discharge on October 15, parents refused to pick her up; also, A did not want to go home. DHS determined that under those circumstances it was not safe for A to return home, scheduled a shelter hearing to take A into protective custody, and filed a juvenile court dependency petition. The petition alleged that A's conditions and circumstances were such as to endanger her welfare.

Specifically, the petition alleged that both parents were unable or unwilling to meet A's mental health needs (allegations 3A and 3F), unwilling to be a custodial resource (3B and 3E), and unwilling to engage in placement and treatment planning that meets A's needs based upon the therapeutic recommendations of A's providers (3C and 3F)—all of which place A at risk of harm.

Tadeo submitted an affidavit for the shelter hearing. It outlined the substance of the three child-welfare-hotline reports, DHS's reasonable efforts to work with parents on safety and discharge planning after the October 9th hotline call, and the conditions and circumstances endangering A.

At the shelter hearing, the juvenile court placed A in the temporary custody of DHS, and then set dates for a settlement conference and jurisdictional trial. On November 24, the date set for trial, parents appeared and stipulated to the juvenile court's jurisdiction and its dispositional order. Parents admitted to a new allegation that had been added in an amended petition filed that day:

> "The condition and circumstances of the above-named minor child are such as to endanger the welfare of the person or of others, as follows:
>
> "3G. The child has a history of ongoing mental health issues that, despite the numerous and diligent efforts of the mother, the mother needs the assistance of the state to access and fully address the appropriate level of treatment and supervision for this child's unique needs.
>
> "3H. The child has a history of ongoing mental health issues that, despite the numerous and diligent efforts of the father, the father needs the assistance of the state to access and fully address the appropriate level of treatment and supervision for this child's unique needs."

In the court's jurisdictional judgment, it dismissed the remaining allegations against parents, 3A to 3F. The court's stipulated dispositional order included, among other things, that parents participate in an Oregon Family Engagement Meeting, attend regular visitation at A's discretion, participate in family counseling when therapeutically

recommended by her treatment team, and participate in her treatment team activities when recommended.[2]

A month and a half after the court took jurisdiction over A, she filed a motion under ORS 419B.881(6),[3] requesting that the court find good cause to relieve DHS from its obligation to provide her parents with her medical information, as ORS 419B.881(3) required.[4] In a supporting declaration, her counsel asserted that

> "[A] does not want her private medical information disclosed to her parents at this time and * * * does not feel supported by her parents at this time. As she was set to transition from Albertina Kerr her parents were not on the same page as her medical providers which is how DHS became involved. This may change as the case progresses, but at this time [A] would like the court to find good cause to restrict disclosure of her medical information."

Mother and father objected, and the juvenile court set a hearing on January 28, 2021. At the hearing, A relied on the shelter affidavit and her own declaration to support her motion, and the juvenile court indicated that it had reviewed the motion. In addition, DHS worker, Benefiel, was called as the only witness. Benefiel testified that she was present at a family-engagement meeting held on December 2. During the meeting, DHS shared what parents could contribute to A's care at that time. Father was present and talking, and he was "argumentative with information giving because he stated he would be unable to really support his

---

[2] Although parents made admissions to jurisdiction and disposition on November 24, 2020, the court did not sign the judgment until December 1, 2020, and the OECI register indicates that the court's judgment was not entered until December 3, 2020.

[3] ORS 419B.881(6) states that, "Upon a showing of good cause, the court may at any time order that specified disclosure be denied, restricted or deferred or make such other order as is appropriate."

[4] ORS 419B.881(3) governs DHS's ongoing duty to disclose case plan and related materials and information to the parties during the pendency of the case. The statute provides, in pertinent part:

> "(a)  When a ward has been placed in the legal custody of the Department of Human Services for care, placement and supervision under ORS 419B.337, the department shall disclose to all parties the case plan developed under ORS 419B.343, modifications to the case plan and any written material or information about services provided to the ward, or to the ward's parent or parents, under the case plan."

daughter if [her] information was not given to him." Benefiel tried to explain that A would continue to progress in counseling, and once A was ready, family counseling could begin, but father "wasn't receptive to hearing that information."

Benefiel also explained that, since that meeting, she had met with parents and explained that she could only give them basic information until the motion hearing. She informed parents that A was in counseling, doing well in her placement and happy there, but A had requested that DHS not share any further details. Also, Benefiel had not asked for treatment recommendations on parents' involvement because A's counselor had only been working with A for three weeks and was still learning about A's childhood and experiences.

When father's counsel asked about what services DHS was offering to parents, Benefiel responded that no services could be offered until A was ready. It would be up to A when to incorporate family counseling and visitation.

DHS's counsel asked what was being offered to A to support reunification with her parents. Benefiel responded that the main service was starting counseling, and then Seneca House offered their own treatment with weekly meetings and treatment plans. Also, A was referred to the Independent Living Program (ILP) to gain independent living skills as well as WRAP. Parents could be involved in those things once the treatment providers considered it therapeutically appropriate. Benefiel explained additionally, that she intended to coordinate with service providers to get their input on when it was appropriate to involve parents in A's services so A would not be the only one making a decision about her treatment. The reason that she had not yet done so was because she was waiting to find out the results of the hearing as well as to allow A's new counselor to get to know her better before asking for input.

Although not sworn in as a witness, father spoke and stated that his only goal was to help A be healthy and happy, and he knew A had a lot of mental difficulties. In his opinion, A choosing to restrict information was only because A "has a problem [and] that problem just keep[s] coming back to haunt her, which is oppositional defiant disorder."

Additionally, father denied that he was argumentative at the December 2 family-engagement meeting. Father characterized his interactions as "very positive, we had a great conversation" and that he was "very open and very cooperative" and shared as "much [] information [as] I can, so that's all I can say right now."

At the close of the hearing, the juvenile court granted the motion to restrict the disclosure of A's medication information. The court explained that it did

> "believe at some point the nondisclosure of that medical information to [A's] parents will disrupt and delay reunification and that will no longer be acceptable, but at this point I think that based on [A's] behavior, it's clear that providing the information is going to further delay the goal of reunification and, since that is still the goal of this case and of the Court, it's appropriate to grant the motion at this time and revisit it based on the medical information that is provided to DHS and coordinated with the goals of the plan."

On February 11, the juvenile court entered a written order finding good cause and restricting disclosure of A's medical information to parents. Parents appealed that order.

On appeal, parents contend that (1) there was legally insufficient evidence to find good cause; (2) the court impermissibly relied on the shelter affidavit; (3) the restriction on access to A's records risks allowing her to manipulate her treatment to avoid having to follow parents' rules and possibly delay or prevent reunification; (4) A does not have a statutorily protected privacy interest in precluding parents from receiving her records; and, finally, (5) regardless of A's right to privacy, restriction of information was in direct conflict with DHS's obligation to provide reasonable efforts and services to parents and tantamount to a change in the case plan.

DHS responds that there was legally sufficient evidence to support good cause because parents' behavior was historically detrimental to A's mental-health treatment as evidenced by the shelter affidavit, her counsel's declaration attesting to A feeling unsupported in her treatment, and DHS's testimony regarding parents' resistance to DHS's

plan to delay integrating them into family counseling and visitation until A agreed and/or in consultation with her treatment providers. Also, DHS notes that father's argument regarding the shelter affidavit is unpreserved and argues that we should not exercise our discretion to review any alleged plain error. Additionally, to the extent that father argues that the juvenile court erred by relying on the declaration supporting A's motion, DHS contends that that argument is also unpreserved and also fails as a matter of law. *See, e.g.*, *Southern Pacific v. Bryson*, 254 Or 478, 480, 459 P2d 881 (1969) (counsel's affidavit filed with motion for discovery was the evidence on which the issue of good cause was to be decided).

Alternatively, DHS contends that there was a second, independent basis for the court's good cause finding: that A was 16 years old and had the right to keep her medical information from her parents. *See* ORS 109.675(1) (minors who are 14 years old or older have right to obtain outpatient diagnosis or treatment for mental or emotional disorders from certain licensed professionals without parental knowledge or consent); ORS 409.225(2)(e)(A) (child in DHS's care can object to DHS's disclosure of her records to her parents by objecting to the disclosure).[5]

Parents reply that the record does not establish that either ORS 109.675(1) or ORS 409.225(2)(e)(A) support the nondisclosure order. Mother notes that the state did not raise ORS 409.225(2)(e)(A) below, and in any event, we should not consider it on appeal because the record may have developed differently given an exception found in ORS 409.225(3). *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (declining to affirm trial court on alternative basis "if the losing party might have created a different record below had the prevailing party raised that issue, and that record could affect the disposition of the issue") (emphasis in original). Also, mother argues that "permitting A to control the timing and delivery of reunification services indefinitely is contrary to the

---

[5] In its responding brief, DHS noted in a footnote that the case was possibly moot because parents appealed a subsequent order continuing to limit parents' access to A's medical records. Having considered the arguments on that point, we conclude that this appeal continues to present a live controversy.

dependency code's goal of family reunification." Additionally, denying parents any information about A's medical care, and allowing her to decide when or whether parents can have that information and become involved in her treatment, has precluded DHS from providing parents with any services, despite the juvenile court initially ordering visitation and family counseling.

Father echoes mother's arguments and argues that restricting parents' access to A's medical record because of their past behaviors is punitive. He contends that there was no evidence showing that the medical providers recommended restriction or that providing it would harm A or adversely impact her treatment. Instead, the record establishes that parents need information about A's medical conditions so that they can work to alleviate the concerns underlying dependency jurisdiction, and the "totality" of the information in the record still falls short of establishing good cause.

The parties' competing contentions require us to resolve two questions: (1) What is the proper appellate standard of review of a juvenile court's "good cause" determination under ORS 419B.881(6)? and (2) What considerations properly bear on the juvenile court's determination of the existence of "good cause" for purposes of ORS 419B.881(6)? The resolution of those two questions determines our disposition as to whether or not the court's finding of good cause was erroneous. If we determine it was not erroneous, we then must determine whether the court abused its discretion in ordering a restriction of the medical information. That standard of review flows from the fact that, upon a determination of good cause, the trial court's authority to restrict disclosure is discretionary under the terms of the statute. ORS 419B.881(6) (upon a showing of good cause, the court "may" order that disclosure be restricted "as appropriate").

We start with the standard of review. We have not previously addressed the question of the applicable standard of review concerning a finding of "good cause" to restrict discovery under ORS 419B.881(6). In other contexts, both we and the Supreme Court have held that whether good cause exists is generally a legal question. *See DHS v. Three*

*Affiliated Tribes of Fort Berthold*, 236 Or App 535, 550, 238 P3d 40 (2010) (rejecting the parties' argument that "good cause" to depart from the Indian Child Welfare Act (ICWA) placement preferences is a matter of judicial discretion) (citing *State v. Johnson*, 339 Or 69, 86, 116 P3d 879 (2005)). *Johnson* supplies the rationale for that approach:

> "We acknowledge the temptation to treat indefinite terms like 'good cause,' 'sufficient reason,' and 'reasonable period of time,' as calling for a subjective determination * * *. However, it is clear that, when such terms appear in a statutory context, they are focused on real, albeit sometimes difficult to discern, legal standards: the legislature's view of what is 'good,' 'sufficient,' or 'reasonable.' As such, in the absence of a factual dispute, a determination that 'good cause' not to dismiss has been shown * * * invokes an objective standard and must be reviewed for legal error."

339 Or at 86 (emphasis omitted). We previously applied that rationale in the dependency context in *Three Affiliated Tribes of Fort Berthold*, where we were called upon to address a "good cause" determination for the purpose of ICWA. In that case, we explained that "[t]he Supreme Court's reasoning in *Johnson* applies equally to a 'good cause' determination in the context of ICWA's placement preferences," because we were unable to discern an intention on the part of Congress that we take a different approach with respect to the federal statute at issue. *Three Affiliated Tribes of Fort Berthold*, 236 Or App at 550.

As was the case in *Three Affiliated Tribes of Fort Berthold*, the Supreme Court's reasoning in *Johnson* applies with equal force here. That is, we see no basis in the text, context, or history of the statute that suggests a legislative intention to depart from the Supreme Court's view that an inexact phrase such as "good cause," when it appears within a statute, establishes an objective standard, the application of which is reviewed for legal error.

Next, we must determine whether the juvenile court legally erred when it concluded that A had demonstrated good cause to restrict the disclosure of her records to her parents. ORS 419B.881(6) does not define "good cause" nor does the statute give guidance on what criteria the court

should consider in making its determination of whether or not there is good cause. Nonetheless, we take our cues, again, from *Three Affiliated Tribes of Fort Berthold*. There, in evaluating whether the juvenile court legally erred in determining that there was good cause to depart from ICWA's placement preferences, we explained that "we need not identify the universe or totality of considerations that might bear on good cause" because "the trial court's 'good cause' determination in this case was ultimately predicated on a consideration that is legally sufficient by itself to establish 'good cause' and that is supported by evidence in this record." *Id.* at 553. That consideration was harm to children, that is, whether, absent departure, the children would experience serious harm. *Id.* at 553-54. We explained that it was consonant with the underlying policies of ICWA to determine that there was "good cause" to depart from its presumptive provisions where compliance with its provisions risked serious harm to children. *Id.* at 553. Because the purpose of ICWA is to protect Indian children, "'Good cause' properly and necessarily includes circumstances in which an Indian child will suffer serious and irreparable injury as a result of the change of placement." *Id.* at 554.

Here, as noted, the juvenile court's oral ruling reflects that it determined good cause was present because (1) A's behaviors indicated that disclosure would cause delay in reunification; (2) nondisclosure was temporary; (3) at some point, the nondisclosure would be disruptive and an unacceptable delay in reunification; (4) the court would revisit the nondisclosure based upon medical information provided by DHS and in support of the case plan.

Similar to what was the case in *Three Affiliated Tribes of Fort Berthold*, each of those considerations are consonant with the purpose of the dependency code and, thus, necessarily the types of considerations that are legally sufficient to provide good cause. Two primary purposes of the juvenile code are to protect children who face dangerous situations at home and to promote family reunification through services designed to remedy dangerous home situations. *See, e.g.*, ORS 419B.090 (setting forth policy objectives of the juvenile code). As in *Three Affiliated Tribes of Fort Berthold*, "good cause" for restricting disclosure in this

context necessarily and properly includes the considerations that disclosure would be harmful to the child or would serve to impede reunification of the family when reunification remains the goal.

Finally, to the extent that parents contest the sufficiency of the evidence supporting the juvenile court's factual findings that underpinned its good cause determination, there was legally sufficient evidence to support a finding both that disclosure would be harmful to A and would delay reunification. As A's declaration and the shelter affidavit recounted, there were three hotline reports regarding parents' inability to support A's mental-health-treatment needs in an appropriate and safe manner. The third report led to DHS involvement and DHS's attempt to facilitate an agreement with parents about a discharge plan from Albertina Kerr—to avoid DHS custody.

Treatment providers repeatedly offered different recommendations for safety and discharge planning, but parents rejected every plan and refused to engage in safety planning for A to allow her to return home. Ultimately, DHS determined that it was necessary to take A into protective custody because parents would not cooperate with treatment recommendations and A was at risk of harm. In the shelter affidavit, Tadeo attested, among other things, that A

> "is newly out of a crisis and is especially vulnerable. [A] has demonstrated countless times while in family therapy becoming easily dysregulated when interacting with [father]. Neither of parents demonstrate the ability to be flexible in their communication style or use the techniques being presented to them that would be appropriate or beneficial when caring for a teenager who is Autistic and struggling to survive a mental illness. Mental health providers and the agency agree that in order for [A] to continue her progression in managing her mental illness it is vital that [A] have ample support, encouragement and positive reinforcement to keep her safe and stable."

After parents stipulated to the court's juvenile court jurisdiction, a family-engagement meeting was held on December 2. Benefiel testified that when DHS explained to parents that the child wanted to limit the information received, father became "argumentative" even though DHS

intended to provide counseling once the child was ready. That evidence all supports the juvenile court's finding that parents' involvement with A's treatment would put her stability and progress at risk.

We acknowledge and appreciate parents' concern that restriction might delay or prevent reunification and parents' belief that they could not make progress without the information regarding A's medical care and treatment. However, the record *does not* support a finding that parents were being denied timely and appropriate services *because of* a restriction of information nor does the record support a finding that the restriction on disclosure would cause more delay to reunification. To the contrary, the record supports the court's finding that the temporary restriction of information would support A's ability to stabilize and therefore move towards integrating parents into family therapy as well as promote A's desire for visitation with parents.

In sum, we conclude that the evidence was legally sufficient to establish the juvenile court's determination of "good cause" under ORS 419B.881(6).

The remaining issue is whether the juvenile court abused its discretion in restricting disclosure of A's records. *See* ORS 419B.881(6) ("Upon a showing of good cause, the court *may* at any time order that specified disclosure be denied, restricted or deferred or make such other order as is appropriate." (Emphasis added.)). The plain text of the statute makes a restriction on disclosure discretionary with the juvenile court, once the court has determined that good cause has been shown. We review that determination for an abuse of discretion. *See Dept. of Human Services v. A. D. G.*, 260 Or App 525, 534, 317 P3d 950 (2014) ("If the court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, then the court did not abuse its discretion." (Internal citation and quotes omitted.)).

Parents argue that restricting parents' access to A's medical records because of their past behaviors is punitive, and it prevented parents from making any progress.

DHS responds that the juvenile court acted within its discretion by balancing parents' needs for the medical

information with A's need for productive mental-health treatment. Further, DHS argues that the court's balancing was bolstered by the court's finding that restricting disclosure will allow A to progress more quickly with treatment, and, thus, allow reunification to occur more quickly.

Here, we agree with DHS that the juvenile court was balancing the child's and parents' legal rights and interests. The record reflects that the juvenile court's primary consideration was preventing harm to A, and, secondarily, expediting the process of reunification. Despite parents' arguments otherwise, there is no evidence that the juvenile court's focus was punitive. *See Dept. of Human Services v. T. L. H. S.*, 292 Or App 708, 715, 425 P3d 775 (2018) (explaining that juvenile dependency proceedings are not meant to be punitive in nature). And, as outlined earlier, parents' progress would not be impeded by a lack of information— rather, A's stabilization was necessary for all the remaining services to be put into place. Therefore, there was a logical and timely order in which DHS's efforts and services were being provided.

In short, the juvenile court's decision to restrict the disclosure in this case was guided by the paramount concern for A's well-being and the goal of expediting reunification. Thus, we conclude that the court's decision was based upon legally permissible considerations, and the court did not abuse its discretion. *Cf. State ex rel Juv. Dept. v. G. A. K.*, 225 Or App 477, 487, 201 P3d 930, *rev den*, 346 Or 157, 206 P3d 191 (2009) (concluding that the juvenile court's sanction for discovery violation of ORS 419B.881(9) was an abuse of discretion because the violation was not willful and the court failed to consider the interests of the children in excluding DHS's evidence).[6]

Affirmed.

---

[6] We note that ORS 409.225(2)(e)(A) may have provided a separate limitation on the dissemination of A's records to her parents; DHS argues as much on appeal. Ultimately, we need not resolve whether the juvenile court would have been required to grant A's request under ORS 409.225(2)(e)(A) because the court's good cause finding and decision to restrict the records were not predicated upon the child's legal right under ORS 409.225(2)(e)(A), and were, for reasons explained, otherwise correct.