Argued and submitted June 8, reversed and remanded with instructions to award custody to mother and for reconsideration of child support and parenting plan provisions; otherwise affirmed September 1, 2010

In the Matter of the Custody of M. T., a Minor Child.

Brian Phillip TURNER, *Petitioner-Respondent,*

*and*

Katherine Leanne MULLER, *Respondent-Appellant.*

Polk County Circuit Court
04P2393; A143240

238 P3d 1003

A. B. Cummins, Jr., argued the cause and filed the briefs for appellant.

Sarah A. Baldwin argued the cause for respondent. With her on the brief was O'Neill & Baldwin, LLC.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

Mother appeals a supplemental judgment changing custody of the parties' daughter, M, from mother to father.[1] On appeal, mother contends that the trial court erred in its custody determination because father had not demonstrated the requisite substantial change in circumstances and that, even if he had, a change in custody was not in M's best interests. For reasons that we will explain, even assuming that father demonstrated that there had been a substantial change in circumstances, on *de novo* review, ORS 19.415(3)(b), father did not establish that a change in custody was in M's best interests. Accordingly, we reverse and remand.

■    Before turning to the facts of this case, we begin by identifying our standard of review. Historically, in domestic relations cases, we have reviewed the facts *de novo* pursuant to prior versions of ORS 19.415(3). *See, e.g., Hamilton-Waller and Waller*, 202 Or App 498, 123 P3d 310 (2005) (reviewing the facts *de novo* in a domestic relations case involving a change in custody). "In other words, we independently assessed and evaluated the evidence and reweighed the facts and reassessed the persuasive force of the evidence." *DHS v. Three Affiliated Tribes of Fort Berthold*, 236 Or App 535, 538, 238 P3d 40 (2010) (internal quotation marks, brackets, and citations omitted). In 2009, however, the legislature changed our standard of review by amending ORS 19.415.[2]

■    Currently, ORS 19.415(3) provides, in part:

"Upon an appeal in an equitable action or proceeding, review by the Court of Appeals shall be as follows:

"* * * * *

"(b)   Upon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals,

---

[1] In that judgment, the trial court also denied mother's motion to hold father in contempt and vacated the child support award in an earlier judgment in response to one of father's motions. Those rulings are not at issue on appeal.

[2] The 2009 amendments to ORS 19.415 apply to appeals, such as this one, in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, § 3.

acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."

Pursuant to ORS 19.415(3)(b), because this case does not concern the termination of parental rights, we do not need to review *de novo* but have discretion to do so.

As we explained in *Three Affiliated Tribes of Fort Berthold*, "[o]ur decision whether to exercise that discretion is governed by a temporary amendment to ORAP 5.40 that is embodied in Chief Judge Order 09-06."[3] 236 Or App at 539. In particular, ORAP 5.40 provides, in part:

"The appellant's opening brief shall open with a clear and concise statement of the case, which shall set forth in the following order under separate headings:

"* * * * *

"(8)(a)  In those proceedings in which the Court of Appeals has discretion to try the cause anew on the record and the appellant seeks to have the court exercise that discretion, the appellant shall concisely state the reasons why the court should do so.

"(b)  In those proceedings in which the Court of Appeals has discretion to make one or more factual findings anew on the record and the appellant seeks to have the court exercise that discretion, the appellant shall identify with particularity the factual findings that the appellant seeks to have the court find anew on the record and shall concisely state the reasons why the court should do so.

"(c)  The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases. Consistently with that presumption against the exercise of discretion, requests under paragraph (a) or (b) of this section are disfavored."

(Footnote omitted.)

---

[3] The text of Chief Judge Order 09-06 may be found on the Oregon Judicial Department's website at http://www.ojd.state.or.us/web/ojdpublications.nsf/Files/Temporary_Amendments_to_ORAP_5.40_and_ORAP_5.45.pdf/$File/Temporary_Amendments_to_ORAP_5.40_and_ORAP_5.45.pdf (accessed Aug 18, 2010). The order provides that the temporary amendment to ORAP 5.40 expires "on December 31, 2010, if not previously adopted as a permanent amendment."

"To summarize, ORAP 5.40(8)(a) and (b) require that, if an appellant seeks to have us exercise our discretion to review *de novo*, the appellant must include a concise statement explaining the reasons why we should do so in its statement of the case in the opening brief." *Three Affiliated Tribes of Fort Berthold*, 236 Or App at 540. In light of that request, our decision whether to exercise discretion is guided by the nonexclusive list of considerations stated in ORAP 5.40(8)(d), which provides:

"The Court of Appeals considers the items set out below to be relevant to the decision whether or not to exercise its discretion to try the cause anew on the record or make one or more factual findings anew on the record. These considerations, which are neither exclusive nor binding, are published to inform and assist the bar and the public.

"(i)     Whether the trial court made express factual findings, including demeanor-based credibility findings.

"(ii)     Whether the trial court's decision comports with its express factual findings or with uncontroverted evidence in the record.

"(iii)     Whether the trial court was specifically alerted to a disputed factual matter and the importance of that disputed factual matter to the trial court's ultimate disposition of the case or to the assignment(s) of error raised on appeal.

"(iv)     Whether the factual finding(s) that the appellant requests the court find anew is important to the trial court's ruling that is at issue on appeal (*i.e.*, whether an appellate determination of the facts in appellant's favor would likely provide a basis for reversing or modifying the trial court's ruling).

"(v)     Whether the trial court made an erroneous legal ruling, reversal or modification of which would substantially alter the admissible contents of the record (*e.g.*, a ruling on the admissibility of evidence), and determination of factual issues on the altered record in the Court of Appeals, rather than remand to the trial court for reconsideration, would be judicially efficient."

Nevertheless, a presumption exists "against the exercise of discretion" and we will exercise it "only in exceptional cases." ORAP 5.40(8)(c).

In her opening brief in this case, mother requests that we review *de novo*. Our understanding is that mother requests that we exercise our discretion to review *de novo* because the trial court's judgment does not demonstrate that, in determining the best interests of M, the court considered the relevant statutory factors set out in ORS 107.137, the text of which is set out below. 237 Or App at 202-03.[4] In deciding whether to exercise our discretion to review *de novo* in this case, two interrelated considerations described in ORAP 5.40(8)(d) inform our decision—namely, ORAP 5.40(8)(d)(i) concerning "[w]hether the trial court made express factual findings, including demeanor-based credibility findings" and ORAP 5.40(8)(d)(ii) concerning "[w]hether the trial court's decision comports with its express factual findings or with uncontroverted evidence in the record."

In summarily determining that "[i]t will be in [M's] best interest to live with her Father," the trial court made several "express factual findings." ORAP 5.40(8)(d)(i). Ordinarily, such findings would tend to militate against the exercise of *de novo* review. *See Three Affiliated Tribes of Fort Berthold*, 236 Or App at 541 n 6 (noting that, "even if we were to consider the tribes' belated request, we would decline to exercise our discretion to review *de novo*, particularly where, as here, the trial court issued extensive factual findings, ORAP 5.40(8)(d)(i), and its decision comports with those findings, ORAP 5.40(8)(d)(ii)").

■ However, the court's express findings in this case are limited and do not mirror the statutory factors in ORS 107.137(1) such that we can conclude that the court considered them as it is required to do. Further, apart from those express findings of fact, we cannot discern the extent to

---

[4] We note that the parties never married. Nonetheless, because they have the same rights and responsibilities as married or divorced parents, the trial court was required to consider the factors in ORS 107.137. *See* ORS 107.135 (providing for modification of a judgment); ORS 107.137 (providing that, in determining the best interests of a child as part of a custody determination, "the court shall consider" various relevant factors, including the emotional ties between the child and other members of the family, the interest of the parties in and their attitude toward the child, the desirability of continuing existing relationships, the preference for the child's primary caregiver, and the willingness and ability of each parent to facilitate a close and continuing relationship between the child and the other parent); ORS 109.103 (applying ORS 107.135 and ORS 107.137 to unmarried parents).

which the ultimate determination of best interests may have depended on implied findings of fact that relate to the statutory factors. Moreover, the court's lack of explanation in the judgment as to the reasons why its findings support its best interests determination hampers our ability to understand the specific factual findings that underlie it. ORAP 5.40(8)(d)(i), (ii). For those reasons, we exercise our discretion to review the facts concerning the trial court's best interests determination *de novo*.[5]

■ Accordingly, we review *de novo*, deferring to the "trial court's credibility judgments insofar as they are based on demeanor[.]" *Uwimana and Rwangano*, 209 Or App 693, 696, 149 P3d 257 (2006). Consistently with that standard, we find the following facts.

■ As noted, mother and father never married. M was born in 2002 and lived with both parents until their separation approximately two years later. In November 2005, the trial court entered a judgment granting mother sole custody of M and awarding father liberal parenting time. That judgment was modified in March 2008, when the trial court entered a judgment that reduced father's parenting time.

A few months later, during the summer, mother moved from Keizer to Bend, after notifying father of her intent to do so. Thereafter, in September, father filed a

---

[5] In *Olson and Olson*, 218 Or App 1, 14-16, 178 P3d 272 (2008), we discussed the importance of a trial court's express factual findings and explanation of its reasoning when reviewing the facts underlying a property division *de novo* and the award itself for abuse of discretion. We explained the reason that some trial court decisions are "recalibrat[ed]" on appeal:

"To be sure, a trial court may engage in a truncated analysis that could lead to an award lying within the range of its discretion. We nonetheless examine the trial court's decision based on the pertinent statutory and equitable considerations. In order to earn the measure of deference to which discretionary decisions are entitled on appeal, a trial court's property award must reflect the exercise of discretion under the correct methodology, and it must lie within the range of legally permissible outcomes. If a decision fails in the former respect, our own analysis may produce a recalibrated, even if not dramatically different, award on appeal. That is the circumstance here."

The circumstances here are analogous. Although a trial court is not required to make extensive, detailed findings or provide an in-depth analysis of its reasoning in this situation, its decision whether to do so is a factor in our decision whether to exercise our discretion to review *de novo*.

motion in which he sought to set aside the March 2008 judgment and obtain custody of M. In support of his motion, father contended that there had been a substantial change in circumstances and that awarding him custody was in M's best interests based on two overarching circumstances. First, according to father, the move to Bend had taken both mother and M away from supportive family and friends, M's life had become less stable because mother had lived in several residences since moving there, and M's school attendance and performance had suffered. Second, father expressed concern about mother's decision to "live[ ] with a convicted felon[, Crane,] who regularly shoots and possesses guns, has $60,000 in restitution to repay, and drives [M] around without a license with Mother's implied consent."

Mother disagreed that a change in custody was warranted. She contended that father had failed to establish that a substantial change in circumstances had occurred since the court's entry of the March 2008 judgment. Mother also contended that, in light of the factors in ORS 107.137(1), it was in M's best interests for mother to retain custody.

A detailed recitation of the evidence presented at the June 2009 hearing concerning the parties' specific grievances would not benefit the bench, the bar, or the public. It is sufficient to make the following four points that ultimately inform our analysis.

First, M has emotional ties to members of mother's and father's extended families, many of whom reside in the mid-Willamette Valley area and some of whom have played active roles in caring for M and facilitating her transfer between parents for parenting time. Further, at the time of the hearing, mother was engaged to Crane, and they had a son who was born in late 2008. M's maternal grandmother described M's relationship with Crane as "excellent" and indicated that M has "[a] very good bond" with her baby brother. At the time of trial, father was also engaged to be married, and he and his fiancée, Gish, have two sons. The evidence concerning M's relationship with Gish is equivocal, but M has a "very close" relationship with her two brothers.

It is significant that father has not demonstrated that those relationships have suffered even after M moved to

Bend. Mother's family visits M and helps in caring for and transporting M after her parenting time with father. Further, M's relationships with father's extended family do not appear to have suffered.

Second, although M lived with mother and father for approximately two years before their separation and has had parenting time with father throughout her life, mother is M's primary caregiver. As pertinent to that issue, a 2007 custody evaluation was admitted as evidence during the 2009 hearing.[6] In that evaluation, Carr, the custody evaluator, indicated that "[mother] is in fact [M's] primary parent."

Carr also testified at the 2009 hearing after "one short visit" with M. When asked whether mother's move to Bend would cause her concern, Carr responded, "I found [mother] to be a capable and good mother, and I wouldn't expect her having moved to a new location to have changed that." Further, when Carr was asked about the effect of placing M with father, she stated:

"I think that would have serious psychological effects on this child, who's * * * very significantly attached to her mother. Her mother was her * * * primary psychological parent.

"There's a lot of conflict between Mom and Dad, and as a result there's an unfortunate separation between Mom['s] and Dad's worlds. And I think she would feel extremely disconnected from her mother, and her sense of safety and well-being would be, I think, incredibly threatened."

Third, there is tremendous animosity between mother and father that, at times, is exhibited in M's presence. That animosity has existed historically as Carr indicated in her 2009 testimony and more specifically in her 2007 report. Further, mother's aunt, who has been "a child therapist for 20-plus years," described mother and father's relationship as "contentious." For example, approximately one month before the 2009 hearing, mother's aunt testified that mother went with her to pick up M from father's home. Mother, apparently upset over a decision that father made concerning a medical

---

[6] Father testified that the parties were unable to afford an updated custody evaluation for the 2009 hearing.

issue involving M, came to the door where the aunt, father, and Gish were talking. Mother was "yelling" and "mad," and, when father attempted to close the door, mother "stuck her foot between the jam and the door." The aunt testified, "I wrapped my arms around [mother], I said, 'No, no, no. We're not doing this. This is not proper behavior[.]' * * * Deescalated her and escorted her off the porch." M observed this outburst.

Finally, as previously indicated, at the time of the hearing mother was engaged to Crane. A police report, admitted as evidence at the 2009 hearing, described interviews with Crane in which he acknowledged his involvement in numerous crimes, including burglary. According to the report, Crane acknowledged that he purchased methamphetamine from and used it with a specific individual. Crane indicated that he used methamphetamine for a period from 2006 to 2007—that is, during the time that several of the burglaries occurred—but that he was no longer using it as of the time the police report was prepared in January 2008. Apparently, the individual from whom Crane purchased the methamphetamine went with him during some of the crimes, and the report states that Crane said that the individual "did not get any money for any of the property that was stolen during all three burglaries. The only thing [that individual] got out of all of this was Crane purchasing drugs from him."

Crane testified at the hearing in 2009. In his testimony, Crane acknowledged that he volunteered information to the police, including information concerning crimes about which the police were not inquiring. According to Crane, he was not charged with some of those crimes. He also denied ever using illegal drugs and claimed that the statements in the police report reflected a "misunderstanding."

In its judgment, the trial court in this case noted that, "[a]lthough Father's description of Mother's fiancé was originally thought by the Court to be rather harsh, the Court changed its mind after hearing him testify and reading [the police report]." On *de novo* review and giving deference to the trial court's demeanor-based assessment, we adopt the trial court's characterization of Crane as "[g]lib and shallow and not evoking confidence in anything he says." Nevertheless—

and significantly—there is no evidence in this record that Crane's relationship with mother and M has been anything other than appropriate.

Following the June 2009 hearing, the trial court entered its judgment. As pertinent, the trial court determined that

"there has been a material change of circumstances warranting a change of custody. It will be in [M's] best interest to live with her Father who seems to be genuinely interested in bettering her circumstances. He is the best parent for M to live with in order to have healthy bonds with BOTH parents."

(Capitalization in original.) Mother appealed.

On appeal, the parties reiterate the various contentions that they raised in the trial court. In determining, on *de novo* review, whether the custody of a child should be changed, we engage in a two-step inquiry, which we most recently summarized in *Bradburry and Bradburry*, 237 Or App 179, 186, 238 P3d 431 (2010):

"The first step is to determine whether, since the last judgment or order regarding custody, there has been a change in circumstances relevant to the capacity of one or both parents to care for the child. *Boldt and Boldt*, 344 Or 1, 9, 176 P3d 388, *cert den*, ____ US ____ , 129 S Ct 47 (2008). If there has been such a change, then the second step is to determine whether a change of custody is in the child's best interests. *Id.* The party seeking the change in custody has the burden of proving both that there has been a qualifying change of circumstances and that a change in custody is in the child's best interests. *Id.*"

In this case, we need not decide whether father has demonstrated a qualifying change in circumstances. That is so, because even assuming that he did, he has not demonstrated that a change in custody is in M's best interests.

In determining whether a change in custody is in the best interests of a child, we are guided by the list of factors in ORS 107.137(1), which provides, in part:

"In determining the best interests and welfare of the child, the court shall consider the following relevant factors:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

None of the factors are dispositive. ORS 107.137(2).

As applied in this case, several of the factors in ORS 107.137 favor neither mother nor father. For example, although the parties have different views about how to parent M, they both have a genuine interest in her well-being and want what they each believe is in her best interests. ORS 107.137(1)(b). Further, as we have previously explained, M has emotional ties to mother's and father's extended families and her siblings and it is desirable for her to continue those relationships. ORS 107.137(1)(a), (c). As of the time of the hearing, those relationships appeared to be intact. Finally, we do not understand the parties to contend that there has been "abuse of one parent by the other" bearing on this custody determination. ORS 107.137(1)(d). Of the remaining two statutory factors, one weighs in favor of father and the other in favor of mother.

We turn to the single factor that weighs in favor of father—that is, "[t]he willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." ORS

107.137(1)(f). Despite the general level of hostility and animosity between mother and father, on balance, father appears to be more willing and able to facilitate and encourage M's relationship with mother than mother would be with respect to facilitating a relationship between M and father. Bluntly, we are not persuaded that mother recognizes the importance of facilitating and encouraging a positive relationship between father and M, which involves, at least in part, respectful interactions with father in M's presence. As previously described, mother's outburst, in M's presence, when she went with her aunt to pick up M from her parenting time with father is illustrative.

Nevertheless, that consideration is counterbalanced by "[t]he preference for the primary caregiver"—mother, in this case—if she "is deemed fit by the court." ORS 107.137(1)(e). That consideration militates powerfully against a change in M's custody.

Here, M, who was seven years old at the time of the 2009 hearing, viewed mother as her primary psychological parent and demonstrated a strong attachment to her. Significantly, according to Carr, a change in custody "would have serious psychological effects" on M, who "would feel extremely disconnected from her mother" and whose "sense of safety and well-being would be * * * incredibly threatened." Further, as father acknowledges in his brief, both he and mother are fit parents and love and cherish M. Under those circumstances, the preference for the primary caregiver weighs in favor of mother and, on balance, indicates that it is in M's best interests to remain in mother's custody.[7]

---

[7] We note that the statutory factors in ORS 107.137(1) are not exclusive. *See* ORS 107.137(2) ("The best interests and welfare of the child in a custody matter shall not be determined by isolating any one of the relevant factors referred to in subsection (1) of this section, or *any other relevant factor*, and relying on it to the exclusion of other factors." (Emphasis added.)). To the extent that father contends that a change in custody is in M's best interests because, after moving to Bend, her life became less stable as illustrated by the fact that M changed residences and the fact that M has had school attendance problems, we disagree. The evidence establishes that the change in residence was not necessitated by mother, and that many of M's absences from school were a result of illness or medical issues. Further, to the extent that father's ultimate contention on appeal is based on his concern about mother's relationship with Crane, we note, that, as described above, father has not demonstrated that Crane's relationship with mother and M has been anything other than appropriate.

In sum, even if we assume that father demonstrated the requisite change in circumstances, he failed to demonstrate that a change in custody was in M's best interests. Instead, in light of the statutory factors in ORS 107.137(1), it is in M's best interests to remain in mother's custody. Accordingly, the trial court erred in awarding father custody of M.

Reversed and remanded with instructions to award custody to mother and for reconsideration of child support and parenting plan provisions; otherwise affirmed.