In the Matter of the Custody of M. T.,
a Minor Child.

Brian Phillip TURNER,
*Petitioner-Respondent,*
*and*

Katherine Leanne MULLER,
nka Katherine Leanne Crane,
*Respondent-Appellant.*

Polk County Circuit Court
04P2393; A148663

284 P3d 1214

Lauren Saucy argued the cause for appellant. On the briefs was A. B. Cummins, Jr.

Russell Lipetzky argued the cause for respondent. On the brief was Sarah A. Baldwin.

Before Armstrong, Presiding Judge, and Brewer, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

This latest chapter in the parties' dispute over the care and custody of their now 10-year-old daughter, M, stems from our decision in *Turner and Muller*, 237 Or App 192, 238 P3d 1003 (2010), *rev den*, 350 Or 231 (2011) (*Turner I*). In that case, we reversed a judgment of the trial court changing custody of M from mother (who lives in Bend) to father (who lives in Dallas) and remanded for the trial court to reconsider the child support and parenting plan provisions. On remand, the trial court entered a supplemental judgment of modification that, although "award[ing] sole legal and physical custody of [M]" to mother "in accordance with the Court of Appeals decision," granted father parenting time with M from Sunday to Friday each week, and one weekend a month, during the school year, and two weeks during the summer. Mother was given the remaining weekends, any nonschool day during the school week, spring vacation, and all but two weeks of summer vacation with M. The court also ordered that all parenting time exchanges take place at father's home, that father have the right to claim M as a dependent for state and federal tax purposes, and that each parent obtain life insurance, with M as the beneficiary, in the amount of at least $150,000. Finally, the court found that father had, in the past, overpaid child support in the amount of $17,388.16; it ordered $10,000 of that amount to be used to offset father's future child support payments and granted father a money judgment against mother for the remainder. Mother challenges each of those rulings on appeal. As explained below, we reverse and remand with instructions.

For purposes of this appeal, the following truncated description of the facts is sufficient. (For a more detailed discussion of the history between the parties, see *Turner I*, 237 Or App at 198-202.) Mother and father, who were never married, separated when M was approximately two years old. Mother was awarded sole custody of M, and father was granted parenting time. In 2008, mother moved from Keizer to Bend, at which time father sought custody of M. Father argued that there had been a substantial change in circumstances and that awarding him custody was in M's best interests. Father's argument was predicated on "two overarching circumstances"—first, that, as a result of the

move, mother and M had lost their support network of family and friends in the Willamette Valley, M's life had become less stable, and her school attendance and performance had suffered; and, second, that mother had decided to live with Crane, a convicted felon.[1] *Id.* at 199. The trial court agreed and, on August 28, 2009, entered a judgment changing custody to father. On appeal, we concluded that the trial court erred. On *de novo* review, we reasoned that, even assuming the requisite change in circumstances, it was in M's best interests to remain in mother's custody, given the statutory factors set forth in ORS 107.137(1) (2009). *Id.* at 202-05.

More specifically, we concluded that ORS 107.137(1)(e) (2009), which states a "preference for the primary caregiver * * * if the caregiver is deemed fit by the court," "militate[d] powerfully against a change in M's custody." 237 Or App at 204. We explained:

> "Here, M, who was seven years old at the time of the 2009 hearing, viewed mother as her primary psychological parent and demonstrated a strong attachment to her. Significantly, according to Carr [the custody evaluator], a change in custody 'would have serious psychological effects' on M, who 'would feel extremely disconnected from her mother' and whose 'sense of safety and well-being would be * * * incredibly threatened.' Further, as father acknowledges in his brief, both he and mother are fit parents and love and cherish M. Under those circumstances, the preference for the primary caregiver weighs in favor of mother and, on balance, indicates that it is in M's best interests to remain in mother's custody."

*Id.* at 204 (omission in original). Consequently, we reversed and remanded "with instructions to award custody to mother and for reconsideration of child support and parenting plan provisions." *Id.* at 205. Our opinion issued September 1, 2010.

On remand, father proposed a parenting plan under which he would receive parenting time with M every Sunday through Friday during the school year and the first full weekend of every month.[2] At the hearing, which was

---

[1] Mother and Crane have since married. Father is also now married, and mother and father each have two "non-joint" children.

[2] Apparently, the hearing that resulted in the judgment at issue on appeal was originally scheduled for the purpose of sorting out issues related to father's alleged overpayment of child support. But, prior to the hearing, father alerted the

held on March 30, 2011, father denied that his proposal represented a change in custody and asserted to the court that, "if you need to make up the parenting time so that [mother] has the majority of the parenting time because she's been awarded custody by the appellate court[,] then make it up during the summer" and other school breaks. He also requested, among other things, that parenting exchanges take place at his house, that he be given "exclusive right to schedule medical and counseling appointments for [M]" and the right to claim M as a dependent for tax purposes,[3] and that each party obtain life insurance in the amount of at least $150,000.

Mother opposed father's parenting time plan and argued that "it kind of sounds like there's a very—almost a change in custody being requested here, when really that—I guess that's not the issue, and *so it's couched in terms of parenting time.*" (Emphasis added.) Mother's counsel explained that the parties had been (presumably in the wake of our decision in *Turner I*) following the local rule regarding parenting time, referring to Polk County Local Rule 8.075 (SLR 8.075), which adopts a standard parenting time schedule. *See* SLR 8.075; SLR 8.075, Appendix 2. Mother did not object to, or otherwise address, father's request for the dependent tax exemption or that both parties obtain life insurance.

At the hearing, the parties also addressed the issue of father's past overpayment of child support. That overpayment was, apparently, the result of an earlier child support order that the court, in the August 2009 judgment, set aside and ordered father to be credited for payments he had made. Father also contended that he had overpaid

court and mother that he would be requesting certain parenting plan provisions in response to our remand in *Turner I*. At the time, review of that decision was pending in the Supreme Court; as noted, review was subsequently denied. 350 Or 231. The appellate judgment in *Turner I* issued on June 7, 2011.

The trial court judgment at issue in this appeal was originally entered on April 20, 2011, and mother filed a notice of appeal of that judgment on May 19, 2011. This court later determined that the trial court lacked jurisdiction to enter the April 20 judgment (because review in *Turner I* was pending at that time). As a result, on October 7, 2011, we issued an order, pursuant to ORS 19.270(4), granting the trial court leave to re-enter the judgment. On October 18, 2011, the trial court re-entered the judgment, and, on October 24, 2011, mother filed a notice of intent to proceed with this appeal.

[3] At the hearing, father asked for the tax exemption at least every other year.

support because mother had claimed "daycare costs that did not exist. It was [mother's] mother watching the child as she always, always had." Father offered as an exhibit a spreadsheet summary (Exhibit 12), which showed, for each month beginning in July 2005, the amount of child support billed, the amount paid, and the amount father "should have paid," as well as a yearly tally of father's overpayment. It reflects an overpayment, as of December 2011, of $17,338.16. Father also offered additional exhibits purporting to support those calculations.

Mother's counsel stipulated to the admission of all of father's exhibits, stating:

"Well, Your Honor, a lot of it's historical. I don't have any problem with you reviewing it. Some are aids to the Court. I have not—like I said, I just got this yesterday and I wasn't aware of the parenting plan piece that he's suggesting until last night. The point that I want to make is that I have not been able to verify the figures on the summary as to what [father's counsel] alleges is owed by my client to [father]. And I note that there's a couple of the calculations in, I think it's Number 13 and 14, that are not done correct[ly]. Whether they would make a difference dollars and cents, I haven't done the calculation. I just noticed that he's got the wrong parties first for putting in information—

"* * * * *

"[MOTHER'S COUNSEL]: —the formula. But, otherwise, you know, have at it and you can review it and—

"THE COURT: Okay. They'll be admitted with that understanding."

Mother also indicated that she had her own exhibits pertaining to the child support issue, but those exhibits were never admitted at the hearing and, thus, are not a part of the record on appeal. Mother and her mother (M's grandmother), however, did testify that mother had incurred child care expenses as the result of grandmother taking care of M. In closing, mother's counsel stated that he did not agree with the "substantial arrearage" father was alleging, but did not explain why it was incorrect. Instead, he suggested that, once the court determined the "income and factors," the state would calculate "if there's an arrearage one way or the other and, you know, that'll take care of that."

The trial court agreed with father in most respects; as noted, it entered a supplemental judgment of modification awarding father parenting time from Sunday evening to Friday evening each week and one weekend a month during the school year and two weeks during the summer, with all exchanges to occur at father's house. It also gave father the ability to claim M as a dependent for state and federal tax purposes and ordered each parent to purchase a life insurance policy in the amount of at least $150,000, naming M as beneficiary.

The court calculated father's monthly child support obligation at $130 per month (plus an additional $78 per month in "cash medical support" if father does not provide health insurance). Regarding the past overpayment, the court found that "[t]he so-called child care evidence was not persuasive," and concluded, referencing father's Exhibit 12, that, "[t]he net overpayment is $17,338.16. *There was no evidence contra.*" (Emphasis added.) The court ordered that $10,000 of that amount be reflected in the records of the Child Support Division of the Department of Justice as an overpayment to offset father's monthly support obligation until the $10,000 is exhausted; the court awarded father a money award against mother for the remaining $7,338.16.

Explaining its adoption of father's suggested parenting plan—which is the primary focus of this appeal—the court referenced M's "bladder control problem" as well as her "problem with homework and being tardy to school"—both of which were at issue in *Turner I*—and concluded:

"Both these problems have been longstanding and Mother either cannot or will not address them until being brought back to court by Father. By allowing Father to have his proffered parenting plan, it will allow Father the opportunity to address those problems—the school problems as well as the bladder control problem."

Although the court stated in its letter opinion that it was declining to grant father's request for exclusive power to schedule counseling and medical sessions for M because "[t]hose are powers left to the custodial parent and that is [mother]," the ensuing judgment found that father's "concept

for a new parenting plan would allow him to [ensure] that his daughter gets the counseling that she apparently needs."

Mother appeals the supplemental judgment, raising five assignments of error. Two of those assignments— specifically, mother's contention that the trial court erred in (1) granting father, the noncustodial parent, the federal income tax dependency exemption without mother's consent and (2) requiring mother to obtain a life insurance policy when she has no duty of support—are unpreserved, and we therefore reject them without further discussion. ORAP 5.45(1), (4)(a).[4]

We turn to mother's primary contention on appeal— that the parenting plan ordered by the trial court constitutes a *de facto* change in custody, which is inconsistent with our decision in *Turner I*, and, therefore, must be reversed. She also requests that, rather than remanding, we exercise our discretion to review that issue *de novo*, ORS 19.415(3)(b), and establish the parenting plan for M in accordance with SLR 8.075.[5] We agree with mother on both of those points.

Father spends the majority of his brief urging us to "reverse" our decision in *Turner I* and award custody to father in accordance with the trial court's 2009 judgment. That argument is misguided: Father never filed a petition for reconsideration of our decision in *Turner I*, the Supreme Court denied his petition for review in that court, and the final appellate judgment issued on June 7, 2011, more than eight months before father filed his appellate brief in this case. In short, there is no legal construct under which father could obtain "reversal" of an earlier, final decision of this court through his current appeal of a subsequent trial court judgment.[6]

---

[4] Mother does not suggest that we should exercise our discretion to review the errors as apparent on the record, and we decline to do so. *See* ORAP 5.45(1); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991).

[5] Although mother refers to SLR 8.085 in her briefing, we assume her to mean SLR 8.075 because that is the local rule that adopts the standard parenting time schedule.

[6] Moreover, father's arguments as to why we should reverse our decision in *Turner I* are, essentially, the same arguments that we considered and rejected in arriving at that decision or that father made, to no avail, in his petition for review of our decision in the Supreme Court. Father has added new factual support for some of his arguments, but those facts relate to events that occurred after the trial

Alternatively, father argues that we should uphold the supplemental judgment in this case under ORS 107.101, which "grant[s] parents and *courts the <u>widest</u> discretion* in developing a parenting plan," (subsection (4)), and requires consideration of "the <u>*best interests of the child*</u> and the safety of the parties in developing a parenting plan," (subsection (5)).[7] (Emphasis and underscoring in father's brief.) In light of those provisions and the factual findings of the trial court, father argues,

> "*[i]t was within the court's discretion to develop a parenting schedule that specifically required M to attend school in Dallas*, where she could have the benefit of Father's help with her homework and attendance, and it was specifically within the court's discretion to award Father parenting time during the school week when his parenting time and help would benefit M the most."

(Emphasis in original.)

We need not decide whether it would ever be within the discretion of a trial court to order a parenting plan such as the one established here. That is so because, in this case, the plan effectively changes custody of the child, in the absence of a motion for change of custody and in direct contravention of a controlling decision of this court. At the very least, the court's discretion does not extend that far.

---

court's custody hearing and judgment in August 2009 and, therefore, do not, in any event, provide support for father's argument that our decision in *Turner I* was incorrect, which was, as required, based on the evidentiary record underlying the trial court's 2009 judgment.

[7] ORS 107.101 provides, in full:

"It is the policy of this state to:

"(1) Assure minor children of frequent and continuing contact with parents who have shown the ability to act in the best interests of the child;

"(2) Encourage such parents to share in the rights and responsibilities of raising their children after the parents have separated or dissolved their marriage;

"(3) Encourage parents to develop their own parenting plan with the assistance of legal and mediation professionals, if necessary;

"(4) Grant parents and courts the widest discretion in developing a parenting plan; and

"(5) Consider the best interests of the child and the safety of the parties in developing a parenting plan."

In *Turner I,* we decided—notwithstanding some of the same concerns father raises again in this proceeding—that it was in M's best interests to remain in mother's custody. That decision was predicated on the fact that mother is M's "primary psychological parent" to whom M "demonstrate[s] a strong attachment" and that changing custody to father would cause M to "feel extremely disconnected from her mother" and threaten her "sense of safety and well-being." *Turner I,* 237 Or App at 204 (internal quotation marks omitted). Notwithstanding that conclusion, however, the trial court on remand has established a parenting plan that accomplishes precisely what our resolution in *Turner I* was explicitly designed to prevent—disrupting M's strong attachment to her primary caregiver and undermining her sense of security and psychological well-being. The practical result of the parenting plan is that M will be required to live with father during the school year, nearly 150 miles away from mother, her primary caregiver. In essence, then, the trial court, in ordering the parenting plan requested by father, effectively changed custody of M during the school year from mother to father. *See Ortiz v. Ortiz,* 310 Or 644, 649, 801 P2d 767 (1990) ("[I]n the context of divorced persons, 'custody' is the legal relationship between a minor child and the legal custodian, *i.e.,* the person to whom the court has given the *primary* rights and responsibilities to supervise, care for, and educate the child: usually that is the person with whom the child lives most of the time." (Emphasis in original.)). *See also Boldt and Boldt,* 344 Or 1, 10, 176 P3d 388, *cert den,* 555 US 814 (2008) (authority of custodial parent to make medical decisions for child is implicit in case law and statutes (citing, *e.g., Ortiz,* 310 Or at 649)); *Hamilton-Waller and Waller,* 202 Or App 498, 501-02, 123 P3d 310 (2005) ("The custodial parent also has an interest in making important decisions regarding the children, such as where they are going to live." (Citing *Ortiz,* 310 Or at 649.)).

In sum, in light of our decision in *Turner I* that a change in custody was not in M's best interests—and in the absence of a request for change in custody, much less a demonstration of the statutorily required prerequisites for ordering such a change—the trial court abused its discretion

in ordering the parenting plan that it did. *See Ortiz*, 310 Or at 649-50 (the considerations at play in a custody determination are much broader than a determination of "visitation rights"). Moreover, for jurisprudential and practical, case-specific reasons—most obviously, the trial court's apparent reluctance to formulate a plan consistent with our decision in *Turner I* and the fact that M's living and schooling arrangements have remained in limbo for far too long—we further conclude that this is an "exceptional case," in which we will acquiesce to mother's request that we exercise our discretion to review the issue *de novo*. *See* ORAP 5.40(8)(c) (we exercise our discretion to review equitable matters *de novo* only in "exceptional cases").

Applying that standard of review, we conclude that adoption of the standard parenting time schedule in SLR 8.075 Appendix 2 (with a modification discussed below) is in M's best interests. ORS 107.101(5). Under that schedule, father will be entitled to parenting time with M every other weekend, as well as alternating parenting time during school vacations and other holidays. The standard schedule in SLR 8.075 also contemplates a mid-week visit between the noncustodial parent and the child every other week, but such visits are not feasible in these circumstances, given the distance between the parties' homes. Therefore, instead of mid-week in-person visits, father shall have mid-week telephone or computer calls with M on the same days as he would have in-person visits under SLR 8.075, and father shall have two more weeks with M during the summer than under SLR 8.075 (for a total of eight of the 12 weeks of summer). Thus, we adopt the SLR 8.075 parenting plan schedule for M, as modified to compensate for father's inability to have mid-week in-person visits with M.

Our decision to follow SLR 8.075 also resolves mother's assignment of error as to the question of responsibility for transporting M for parenting time exchanges. The rule provides that that responsibility is to be shared—specifically, that father, the noncustodial parent, will pick M up at the beginning of the visit and mother, the custodial parent, will pick her up at the end of the visit. SLR 8.075, Appendix 2, § 3.4.1. We adhere to that arrangement.

In mother's final assignment of error, she contends that "[t]he Trial Court's calculation of support and any overpayment of child support by Father is not supported by evidence." Regarding the first prong of that assignment—the trial court's calculation of "current" support—as mother acknowledges in her brief, our implementation of a new parenting plan for M necessarily requires the trial court to recalculate father's child support obligation in any event. *See* OAR 137-050-0730 (percentage of overall parenting time for each parent figures into the support obligation under the required formula). Therefore, we need not address that aspect of mother's assignment except to note that, under OAR 137-050-0725, the scale by which the support obligation is calculated

"presumes the parent with primary physical custody will take the tax exemption for the child for whom support is sought for income tax purposes. When that parent does not take the tax exemption, the rebuttals in OAR 137-050-0760 may be used to adjust the child support obligation."

Here, because the trial court ordered that father receive the tax exemption, and mother did not preserve for appeal her objection to that ruling, the court, in recalculating the support obligation on remand, must adjust for that circumstance according to the rebuttals in OAR 137-050-0760.

That leaves us with the issue of father's past overpayment of child support. As noted, mother contends that the court's calculation of the overpayment is not supported by evidence. The entirety of mother's argument is as follows:

"Father offered a summary prepared by his attorney as Exhibit 12, which was received by the Trial Court without any supporting documentation. It purported to cover the period beginning July 1, 2005 through 2010 and into 2011.

"The decision of the Trial Court refers to Exhibits 13 through 17 which were received in evidence, after Mother objected to the accuracy of the entries. * * *

"* * * * *

"Mother maintains there is no evidentiary support in the record for the overpayment of $17,338.16. Mother suggested through her attorney that the Trial Court refer this matter

to the Department of Justice, Child Support Division, for review and necessary action, but this suggestion fell on deaf ears."

To the extent mother is arguing that Exhibit 12 lacked a proper foundation, that argument comes much too late. As discussed above, 251 Or App at 727, mother stipulated to the admission of father's exhibits. Regarding mother's contention that the record lacks evidentiary support for the trial court's decision, mother is simply wrong. The court relied on father's exhibits indicating that $17,338.16 was the amount of overpayment father was due. As the court below noted, and we repeat here, "[t]here was no evidence contra." Mother does not contend otherwise.

Reversed and remanded with instructions to enter SLR 8.075 (as modified by this opinion) as the parenting plan for M and to recalculate father's child support obligation consistently with that plan and taking into account that father was granted the right to claim M as a dependent for tax purposes; otherwise affirmed.